## Myles Tierney

*v.*

## Chauncey G. Parker, receiver, &c., of the Strong Locomotive Company.

[Filed August 31st, 1899.]

A suit by a stockholder against a receiver of an insolvent corporation to rescind his contract for the purchase of its stock, and to have established against the receiver as a claim the amount paid therefor, on the ground of false and fraudulent representations made to him by the president of the company as to its financial condition and the issue of its stock, cannot be maintained when after such purchase the plaintiff acquired information as to the financial condition of the company and the issue of its stock sufficient to disclose the falsity of the representations, or to put him on inquiry, but took no steps to repudiate the purchase until nearly three years later.

On bill, &c.

*Mr. Henry S. White,* for the complainant.

*Mr. Chauncey G. Parker, pro se.*

*Mr. Patrick H. Gilhooly,* for the stockholders, and *Messrs. Gallagher & Richards,* for the creditors.

Emery, V. C.

The complainant is a stockholder in the Strong Locomotive Company, an insolvent corporation, and the object of this bill, which is filed against the receiver, is to set aside the contract upon which he purchased his shares of stock from the company, to have the sale declared void and to have established against the receiver as a claim the amount which he paid to the company for the stock. The purchase of the stock is alleged to have been procured by false and fraudulent representations made to complainant by the president of the company, as representing the company in the sale.

The company was organized to develop and exploit a patented locomotive, and the false representations alleged by the bill to have been made, related to the value of the patent, the commercial success of the locomotive, the financial condition of the company, and the circumstances of the issue of its capital stock. Complainant purchased his stock in June, 1889, paying $25,000 for five hundred shares of stock, par value $100 each, and his first claim of a right to rescind the purchase of stock was made shortly after the appointment of a receiver of the company, in February, 1893. One question arising upon the pleadings and evidence is whether, on the assumption that the false representations alleged were made, and were of such a character as to entitle the complainant to rescind the contract of sale, the complainant did not shortly after the purchase have such knowledge, or means of knowledge, as to the falsity of the representations, as imposed on him the duty of at once avoiding the contract, if he desired to do so, and whether by his failure to avoid the contract promptly, he must not be held to have elected to stand by the contract of sale, and to be now barred by such election and by laches from disaffirming the contract after the company has become insolvent. This question as to the effect of laches or election, is in such cases usually treated as the preliminary question. *Dennis v. Jones, 17 Stew. Eq. 513, 516 (Errors and Appeals, 1888)*. Considering, therefore, at the outset the evidence relating to this question, I reach the conclusion that at a period not later than June, 1890, the complainant knew that the company was then in a precarious financial condition, and had then such knowledge or information as to the condition of the company, as either showed him the falsity of the statements, upon which he claims to have relied in purchasing the stock, or put him upon inquiry at once, if he desired to rescind the contract. About this time, June, 1890, the company, in order to avoid a failure and to develop the manufacture of locomotives, proposed to enlist capitalists in Cincinnati in the enterprise, and options for the purchase of real estate there had been obtained. Mr. Niven, through whom complainant's purchase of the stock was originally made, and who held complainant's proxy to represent

Tierney v. Parker.

his interests in the company, says that at the time this negotiation was proceeding, he told complainant in detail the situation of the company's affairs, its financial condition, and that unless the Cincinnati enterprise could be carried through, the enterprise would be a failure and his investment would be lost. It was part of the plan in reference to constructing works at Cincinnati that bonds to the amount of $100,000 should be issued to the stockholders at eighty cents on the dollar, and complainant declined to take any bonds or invest any more money. Mr. Niven also says that at the time, in reply to complainant's inquiries, he told complainant specially as to the debts of the company, and that the company had been in much the same financial condition at the time he purchased his shares, and that complainant then told him he (Niven) should have found that out at the time complainant invested his money. Complainant says that he knew from the statements made to him by Mr. Niven that the company had been unable to get capital enough to do business on its own resources, and could not go ahead, and that he then concluded that Mr. Darwin had deceived or misled him as to some of the facts. In his first examination, the date of this information from Niven seems, by complainant's evidence, to be connected with a report in reference to the Cincinnati scheme, which was made as early as December, 1889, but being subsequently recalled, he says that he first knew the company was in a failing condition after August, 1892. The question, however, is not as to the time of his knowledge of the failing condition of the company, for his evidence shows that he did not consider the company in a failing condition until the Cincinnati scheme failed, but as to the time when he received information that material statements, in reliance upon which he alleges his purchase to have been made, were false, and, so far as relates to the statements in relation to the financial condition of the company at the time of his purchase, I conclude that the evidence of Mr. Niven fixes the time when complainant received this information to have been at least as early as June, 1890. Complainant says that he did not complain to the company of the statements made by Darwin, because he believed the plan for

re-organizing the company and the Cincinnati scheme would be a success and the company would be all right.   After this information from Niven complainant still continued to retain and exercise his rights as a shareholder through his proxy to Niven, which was retained and acted on for the purpose of protecting complainant's interest.

The representation made by Darwin in reference to the issue of stock was, as complainant alleges, that no stock of the company had been sold for less than fifty cents on the dollar, being the price which the complainant paid.   It now appears that the entire capital stock of the company ($1,200,000), with the exception of ten shares, had been issued for the purchase of the patents or in exchange for the stock of another company which owned the patents, and was issued as full-paid and non-assessable.   About $400,000 of this stock was returned to the company or conveyed to a trustee, to be sold to raise working capital for the company, at fifty cents on the dollar.   It was so issued and sold, complainant's purchase being of this treasury stock, and none of this stock appears to have been sold for less than fifty cents on the dollar, but complainant now says that he was not informed, at the time of his purchase, of this issue of stock for the patents or stock of the company owning the patents, and that by reason of this suppression the representation made to him as to the issue of stock was false and fraudulent.   The recitals in complainant's written subscription to the stock disclosed that the stock which he was to receive was part of an issue made to a trustee to raise working capital, and that for each $50 paid complainant was to receive one share of full-paid, non-assessable stock of the company of the par value of $100, and pursuant to this contract of subscription the certificate itself for five hundred shares of stock was issued to complainant upon payment of $25,000 and delivered to complainant about June, 1889.   This certificate also was, on its face, declared to be "full-paid and non-assessable" and "issued for property purchased." The written subscription and the form of this certificate and the information contained therein put complainant upon inquiry as to the issue of stock for property purchased, and inasmuch as

his retention of stock so issued had, or might have, the effect of protecting him against further assessment for stock he purchased of the company at fifty cents on the dollar (to which assessment he would have been liable on his present account of his purchase), he was bound to make his inquiries as to the issue of this stock, and stand by or repudiate his purchase of fully-paid stock without delay. These representations as to the financial condition of the company and the issue of its stock were such material inducements to the purchase of the stock by complainant that the falsity of those statements, or either of them, would, if established, have been sufficient to entitle complainant to avoid the sale without reference to the other representations.

Upon considering the entire evidence, I cannot avoid the conclusion that at least as early as June, 1890, complainant had information in relation to the financial condition of the company, and the issue of its stock sufficient to disclose to him the falsity of the representations alleged to have been made to him, or sufficient to put him on inquiry as to their falsity. Such information imposed on him the duty of acting promptly, if he intended to repudiate the purchase and to be relieved from the relation of a shareholder, and his acquiescence in the situation for nearly three years afterwards, and until the company had been declared insolvent, disentitles him to call upon the receiver to rescind the purchase and refund the amount paid. The English cases uniformly deny to the stockholder the right to rescind the contract after insolvency has intervened, and while the American courts do not all adopt this hard and fast rule, all courts agree substantially in the view that contracts for purchase of stock alleged to have been procured by fraud, are contracts which are not absolutely void but are merely voidable at the option of the defrauded party, and that the purchaser must promptly assert his right to rescind, in order to be effectual against the receiver or assignee of an insolvent corporation. The cases in reference to the effect of delay in claiming a rescission are collected in *7 Thomp. Corp.* ¶ *8440.*

These cases establish that diligence in the discovery of the fraud and promptness in the repudiation of the purchase or sub-

scription are necessary conditions for the rescission of the contract. The general rule in New Jersey requiring this promptness in the rescission of contracts alleged to have been procured by fraud, is declared by our own courts in many cases. *Dennis* v. *Jones, 17 Stew. Eq. 513,* and *Conlan* v. *Roemer, 23 Vr. 53,* are instances. In cases like the present, where the capital stock paid in constitutes the fund upon which the company, its creditors and other stockholders are entitled to rely for their protection in the conduct of its business, reasonable diligence in the discovery of the alleged fraud, where the purchaser is fairly put upon inquiry, must also be shown in order to entitle him to a rescission, after insolvency has intervened. Such diligence and promptness have not been shown by the complainant in this case, and his bill should be dismissed for this reason, and without passing upon the question whether the sale can be rescinded after insolvency.